## JAMES GRIFFITH & SONS CO. v. BROOKS.

### SAME v. BYLAND.

(Circuit Court of Appeals, Sixth Circuit.   June 26, 1912.)

#### Nos. 2,222, 2,223.

1. MASTER AND SERVANT (§ 286*)—INJURIES TO SERVANT—NEGLIGENCE—QUESTION FOR JURY.

Where a company which undertook to restore partially destroyed buildings engaged an independent contractor to do certain wrecking work in which a derrick was required, installed, and used by him, it owed a duty to its employés working on the premises under its orders to see that the derrick was properly installed, and to inspect it; and in an action against it by its employés for injuries received from the falling of the derrick through being improperly fastened, where a casual inspection would have disclosed the defect, the question of the company's negligence was for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1010–1050; Dec. Dig. § 286.*]

2. MASTER AND SERVANT (§ 286*)—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

In actions by employés for injuries from the falling of a derrick which was insecurely fastened, the question of whether the employer's

instruction to enter upon the premises was such an assurance of safety as relieved them from their duty to inspect the derrick, if such a duty existed, was for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1010–1050; Dec. Dig. § 286.*]

In Error to the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

Two cases, one by Henry L. Brooks, the other by Howard C. Byland, both against the James Griffith & Sons Company, a corporation. Judgments for plaintiffs, and defendant brings error. Judgments affirmed.

E. S. Aston, of Cincinnati, Ohio (Prescott Smith, on the brief), for plaintiff in error.

T. L. Michie, of Cincinnati, Ohio (B. F. Graziani and T. R. Snyder, on the brief), for defendants in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. These two cases were by consent tried together in the court below. They were brought into this court upon separate records and heard and submitted as one cause, the evidence in both cases being the same except as to the injuries suffered by the defendants below, and the cases will be disposed of in one opinion. The plaintiff in error (hereinafter called company) is a corporation doing business as a building contractor, and the defendants in error (hereinafter called plaintiffs) were at the time in question in the employ of the company. The cases were for personal injuries, and each resulted in a verdict and judgment in favor of plaintiff.

[1] The company entered into contract with the owners of certain lots abutting on the north side of Fourth street, in Cincinnati, to restore two adjoining and partially destroyed buildings thereon. The buildings had been constructed six stories in height, each 25 feet in width by 100 feet in depth, and were separated by a brick wall 30 inches in thickness at the ground and tapering to a thickness of 17 inches at the top. At the date of the contract, the front walls of the buildings were standing and in good condition, except portions near the top of the sixth story; but a large part of the west wall of the west building and the center wall for some distance from its north end had been destroyed by fire and a windstorm, as also the interior of the west building and the north portion of the east building. The front portions of the six floors in the east building were in place and seemingly in safe condition; the sixth floor extending northwardly from the front about 30 feet and the other floors somewhat further for varying distances, the second between 45 and 50 feet, where plaintiffs received their injuries. It was found necessary to take down the upper portions of the front walls and

parts of the fragments of stories extending north. For this purpose the company employed a rigger or wrecker of buildings (Bishop) without reserving, as it is claimed, any right to control or direct either him or his work; in short, employed him as an independent contractor. Bishop hired the use of what is called a stiff-legged derrick, and placed and used it on top of a similar building, standing on the east side of and next to the easterly one of the two buildings under repair. The derrick fell, breaking down the six fragments mentioned.

Considering the object for which the derrick was brought into use, the evidence tends to show that it was defectively assembled and fastened in position. The derrick consisted of a revolving mast with sills and boom, and was equipped with windlass, etc., for operating it. The sills were set at right angles on the roof, one running east and west and close to the front of the building, and the other, north and south near the west wall. Both were bolted through the roof to joists below. The mast was partially sustained by a gudgeon set in the junction of the sills and close to the southeast corner of the east building then under repair. From the outer end of each sill a piece of timber, called a "stiff-leg," extended to the top of the mast as a support, and each was joined to its sill through an angle iron called a "goose neck." The boom was 50 feet in length and used for the purpose (among others) of removing heavy coping stones from the front walls of the injured buildings to the roof of the building on which the derrick stood.

The fault causing the most complaint respecting the derrick was that the stiff-leg extending eastwardly was not properly fastened to its sill. There were three bolt holes in the angle iron, and it is claimed that three bolts should have been used in the fastening, but that only one bolt was used; and, further, that it was only one-half inch, while such bolts should have been five-eighths of an inch in diameter. There was some testimony tending to show that two five-eighths inch bolts were used, but we think the opposing testimony preponderates. There were other fastenings and other defects. But it is not necessary to state further details, for it is clear that this fastening gave way and the derrick fell from a strain caused by an attempt made, with the derrick, to loosen a coping stone of about 2,100 pounds weight. There was testimony tending to show that the derrick would have been sufficient for the uses to which it was put if it had been properly assembled and securely fastened. Its weakness and the great stress exerted by its loads appear to have centered at the point of the imperfect fastening mentioned. The exceptions taken to the charge go only to the parts that relate to "matters fixing a liability" upon the company; and, since verdicts were rendered for plaintiffs, new trials refused, and judgments entered, it must be assumed that if, under the law, the company owed the plaintiffs any duty in respect of the derrick, it neglected to perform it.

The evidence fails to disclose the terms of employment under which Bishop (the rigger) furnished and used the derrick. According to Bishop, the parties "had no contract," and the subject is not made

clear by James Griffith, to whom the president of the company referred as the one who employed Bishop. Bishop testified, however, that he was in charge of the derrick work and that he controlled and paid his men; and the president of the company testified, in answer to a question of the court, that he (the president) told Bishop to do "what the building inspector required him to do." In the view we take of the case, it is not important what the precise legal relations were that existed between Bishop and the company. The company caused the derrick to be brought there as one of the instrumentalities needed in the performance of its contract to restore the buildings. The company knew that the derrick stood on the west edge of the building next east of the injured buildings, and that the use of the derrick involved the swinging of the boom with its loads over them. It is manifest that, unless the derrick was securely fastened, such use of it was a menace to persons working within these fragments of buildings. In these circumstances and conditions, the company was carrying on the work within these fragments.

As it seems to us, this case is not wholly conceived or stated when it is said that the effect of the relations between Bishop and the company was, as regards the installing and use of the derrick, to absolve the company from all responsibility to the plaintiffs. The controlling question is whether the company can escape the general rule that it is the master's duty to exercise due care to provide for his servants a reasonably safe place in which to work. This rule is founded upon the master's possession and control of the premises in which he puts his servants at work. Channon v. Sanford Co., 70 Conn. 573, 579, 40 Atl. 462, 41 L. R. A. 200, 66 Am. St. Rep. 133. We do not find any evidence tending to show that the company was not in possession and control of the premises in question. True, as stated, there is evidence tending to show that Bishop was in control of his work and men; but the work he was then engaged in doing was confined to the removal with the derrick of the portion of the front walls of the injured buildings, beginning at a point about four feet below the top at the east end and extending down to the sill of the west window of the west building and thence to the end of the wall of the sixth story. Neither this nor the privilege of swinging the derrick with its loads either to the roof of the building on which the derrick stood or to points on the premises under repair north of the fragments of stories still standing was apparently intended to exclude the company from the right of possession and control derived through its contract with the owners of the property; and the fact that at the time the derrick fell the plaintiffs were at work on the second floor under orders of the company shows that the company's possession and control were not treated as impaired. The most that can be said is that the derrick and its operation alone were under the control of Bishop.

What, then, is to be said of the company's duty to the plaintiffs and of its performance of the duty, in a situation like this? The order given to them to work upon the second floor was an assurance

of reasonable safety. Simple external inspection would have revealed the fact that two of the three bolts of the angle iron at the foot of the east leg of the derrick were missing. These unfilled holes meant the lack of designed fastenings. We have been, unable to discover any evidence tending to show that the company, through any of its officers or controlling agents, concerned itself about the sufficiency or condition of the derrick, much less that it caused an examination of any kind to be made of it.

In Clark v. Iron & Foundry Co., 234 Mo. 436, 450, 137 S. W. 577, 581, it appears that the company had been employed by the St. Louis & Suburban Railway Company to erect on its premises a coal chute. Clark, an employé of the foundry company, was ordered to pass some of its guy ropes over and under certain electric feed wires belonging to and supported on a pole of the railway company, and while so engaged suffered severe injuries, on account of which the suit was brought against both the foundry and the railway, and recovery was had against the latter, but not the former. The pole bearing the wires was not on the premises on which the coal chute was being built; but it was said:

"The foreman's order to the appellant to ascend the pole and do the work designated was an assurance that the place was reasonably safe for that purpose."

It was contended that, since the pole and wires were not on the premises where the work was to be done, the respondent had no authority or control over them, and consequently had no right to go upon the pole to inspect the wires, but of this the court said (234 Mo. 451–452, 137 S. W. 581):

"This contention in our opinion is unsound, for the reason that the dangers which make the place where the servant is required to work unsafe need not constitute a part and parcel of the place itself, but the danger may, as is often the case, be separate and independent of the place itself, yet so near thereto as to make it reasonably certain that persons while working there are liable to come in contact with said nearby danger and be injured thereby. The test is not that the place within itself is reasonably safe, but it must be reasonably safe from all internal and external dangers which are liable to do injury to the servant. It might be that the building, for instance, in which the servant is required to work is unusually strong and has no inherent defects or dangers whatever, yet who would for one moment contend that the same building would be a reasonably safe place for people to work if on the adjoining lot there stood a much larger and taller building so weakened by storm or fire that it was on the very verge of falling on the smaller."

The case in which recovery was made is Clark v. Railroad, 234 Mo. 396, 435, 137 S. W. 583.

In Wilson v. Hibbert, 194 Fed. 838 (C. C. A. 3d Cir.), Wilson contracted with the owner of a lot to build and complete thereon certain houses; the owner being relieved from any responsibility, etc., and the contractor forbidden to "sublet any part of the general contract to construct said operation." Wilson entered into possession of the premises for the purpose of the building operation and entered into three subcontracts—one for the mason work, one for the carpenter work, and another for the plumbing work—each subcontractor agree-

ing to take the place of the principal contractor respecting the work so sublet, and to be considered as an independent contractor in respect of his part of the work and answerable for any loss or damage caused by his agents or employés. Hibbert, while in the employ of the subcontracting carpenter, received injuries through negligent work of the subcontracting plumber. It was disclosed by the evidence that Wilson's general superintendent had supervision over practically all of the work for Wilson, but this does not appear to have been regarded by the court as controlling, nor does it seem to us to relieve the decision of some analogy here. Judge Gray, in the course of the opinion, said (194 Fed. 841):

"The defendant, as general contractor, necessarily had possession and control of the premises, and, though he made what are called independent contracts for certain portions of the work to be done, he could not relieve himself from liability for a dangerous situation, which, though created by the so-called independent contractor, he passively or actively permits to exist."

It was held by this court in Toledo Brewing & Malting Co. v. Bosch, 101 Fed. 530, 41 C. C. A. 482, that the brewing company was liable for damages suffered by one of its employés through the act of certain roof repairers who had been directed by the company "to do whatever work was necessary on the roof," and who, without the knowledge of the company, removed certain weights by which a beam was held in place on the roof and used to sustain a pulley and attachments for lifting salt to the second story of the brewery; and the question, regarded as controlling, was whether, in view of the contract between the company and the roof repairers, the doctrine in relation to employers and independent contractors was applicable to the facts of the case. The conclusion reached was thus stated by Judge Clark (101 Fed. 535, 41 C. C. A. 487):

"* * * That the master is not relieved from the positive personal duty which he is under to the servant by letting work to a contractor, and that he does not avoid liability in case the work is negligently done, and the servant thereby injured in consequence of exposure to a dangerous place or defect against which, in the discharge of the master's duty, he should have been protected."

In applying the doctrine of liability arising out of the breach of a master's positive personal duty, it is to be observed that there is a tendency at times to confuse it with other doctrines equally well established, as, for instance, with the fellow servant rule; but the line of distinction in this behalf is pointed out in decisions of this court (Deye v. Lodge & Shipley Mach. Tool Co., 137 Fed. 480, 482, 70 C. C. A. 64; Kentucky Block Cannel Coal Co. v. Nance, 165 Fed. 44, 47, 91 C. C. A. 82; Illinois Cent. R. Co. v. Hart, 176 Fed. 251, 252, 100 C. C. A. 49); and so with the rule that binds an owner of property who commits the entire work to be done thereon exclusively to a contractor, from which injurious consequences will arise unless precautionary measures are adopted (Covington & Cincinnati Bridge Co. v. Steinbrock & Patrick, 61 Ohio St. 215, 223, 55 N. E. 618, 76 Am. St. Rep. 375, and cases there cited). It is true that, owing to nice shades of difference in facts and circumstances of par-

ticular cases of this general character, no definite rule can be laid down that would always furnish an easy guide for rightly determining to what class of decisions a given case belongs. It is clear enough, however, that of the decisions of this court just cited the present case is ruled by the principles of the Bosch and Nance Cases. No principle is perceived which involved the intervention of the master in producing the fall of the beam in the Bosch Case and the fall of the drain pipe in the Nance Case that is not applicable to the question whether the intervention of the company was involved in producing the misfortune here. We are confirmed in this view by the recent decision of the Supreme Court in Texas & Pacific Ry. v. Howell, 224 U. S. 577, 582, 32 Sup. Ct. 601, 56 L. Ed. 892. See, also, Bryson v. Gallo, 180 Fed. 70, 76, 103 C. C. A. 424 (C. C. A. 6th Cir.). The derrick now in question was a quasi permanent appliance, requiring care in its installation commensurate with the character of the work to which it was to be applied. If the company had itself rented the derrick and installed and operated it in the same place and work in which Bishop located and used it, the company's duty to plaintiffs to install the derrick with reasonable care would scarcely have been questioned; and it is to misapply the principles of independent contract to insist that this duty ceased simply because the company chose for its own benefit to employ Bishop to do the same thing, and, regardless of the safety of its own servants, suffered him to install the derrick negligently. The reason for the master's care remaining, its duty also remained.

This is strengthened by a consideration of the duty of the company to inspect the derrick. Whether and to what extent a master is bound to inspect a given object must of necessity depend upon the nature of the place and work designed for the service. However (as respects employment usually attended with danger, unless conducted with reasonable care), can it be safely assumed that a place or an instrument, either in itself or by reason of its proximity to something else, will not be dangerous to the employé if no measures are taken to ascertain?

In Clark v. Iron & Foundry Co., supra, 234 Mo. at page 455, 137 S. W. at page 583, where an instruction given in the trial court was under consideration respecting the duty of the company to inspect the electrical feed wires in question, before directing Clark, the employé, to pass ropes and tackle over them, it was held (and this is in addition to what is above shown from the decision in this regard) that it was the company's duty "to make an inspection of the premises and to inquire regarding all hidden or secret dangers that might be in or about the place where respondent's servants were required to work." The present case does not require us to consider the extent of duty there expressed; for an external visual inspection would have revealed the defective fastening of the derrick in question.

In Petroleum Iron Works Co. v. Boyle, 179 Fed. 433, 437, 102 C. C. A. 579, 583, this court considered the duty of inspection as applied to a purchaser from a reputable manufacturer of a valve which subsequently exploded and caused the injuries in question.

No defect in the valve was visible upon its external surface; but during the process of installation the seat of the valve was taken off and the interior remained exposed for about one hour, and one of the pipe fitters who was engaged in installing the valve noticed that the interior surface of the bowl of the valve was punctured with numerous holes of the size of a pin; fifty or sixty of such holes appearing in a space of about two or three square inches. Judge Knappen said:

"The purchaser of an article from a reputable manufacturer is thus justified in assuming, in the absence of anything to the contrary discoverable by ordinary tests, that the article is properly made. But the assumption thus permitted is not absolute in the sense that it absolves from all duty of reasonable inspection, nor in any case does it relieve from an inspection as to defects discernible by superficial examination."

Again (179 Fed. 439, 102 C. C. A. 585):

"We think that under the circumstances presented the court did not err in submitting to the jury the question whether the defect in question was a latent defect which ordinary care might not discern, nor whether ordinary care did not require, under the circumstances presented, at least a visual inspection of the interior of the valve."

There is apparent analogy between the duty resting on a master to inspect an appliance bought from a reputable manufacturer, which appliance the master was regularly using in his business (this being the duty declared in the Boyle case) and his duty to inspect an appliance leased or temporarily obtained by him from its owner to be used on or in connection with the master's premises, even though such use may be under the immediate supervision of the owner. In each case, the master, acting pursuant to a contract with a third person, has brought upon the master's premises an appliance which makes those premises an unsafe place to work.

See, also, Bush v. Cincinnati Traction Co., 192 Fed. 244, 245, 112 C. C. A. 499 (C. C. A. 6th Cir.); Winslow v. Building Co., 147 Iowa, 238, 245, 124 N. W. 320, 28 L. R. A. (N. S.) 563.

[2] It follows that the case was rightly submitted to the jury upon the question of the company's negligence; and likewise as to the claim of contributory negligence of the plaintiffs, for the company's instructions to them to enter upon its work on the second floor was such an assurance of safety as to render their failure to inspect the derrick, assuming, without deciding, that it was their duty to inspect, as in the end to present merely a question of fact.

Each judgment must be affirmed, with costs.